Mei Juan REN and Sheng
Ping Ou, Petitioners,

v.

John ASHCROFT, United States
Attorney General,
Respondent.

No. 04–1702.

United States Court of Appeals,
First Circuit.

Aug. 16, 2005.

Chun Wai Wong, on brief, for petitioners.

Jennifer J. Keeney, Trial Attorney, Office of Immigration Litigation, Civil Division, with whom Peter D. Keisler, Assistant Attorney General, and Emily Anne Radford, Assistant Director, were on brief, for respondent.

Before BOUDIN, Chief Judge,
TORRUELLA and HOWARD, Circuit Judges.

TORRUELLA, Circuit Judge.

Petitioners Mei Juan Ren and Sheng Ping Ou appeal the Board of Immigration Appeals' ("BIA") order dismissing petitioners' appeal from the Immigration Judge's ("IJ") decision denying their applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").[1] Petitioners assert that the BIA erred in finding that (1) petitioners' testimony regarding past persecution was

---

1. Petitioners' brief addresses only the BIA's denial of their application for asylum. They make no argument regarding withholding of removal or relief under the CAT. Petitioners have therefore waived any challenge to the BIA's decision on these issues. *See Qin v. Ashcroft*, 360 F.3d 302, 305 n. 5 (1st Cir. 2004).

inconsistent and therefore implausible and (2) petitioners do not have a well-founded fear of future persecution based on the birth of their U.S. citizen child. After careful review, we remand the case to the BIA for further proceedings.

Petitioners are natives and citizens of China. They were married in China on April 17, 1995. They have two children, one born in China on September 11, 1995, who continues to reside in China, and one born in New York City on August 17, 2002. Petitioners seek asylum on the basis of past persecution and a well-founded fear of future persecution under China's one-child population control law. *See* 8 U.S.C. § 1101(a)(42).

Ren arrived in the United States at Honolulu International Airport on December 20, 1999, where she was detained for lacking documents or any proof of identity by immigration officials. On January 26, 2000, the INS[2] served Ren with a Notice to Appear, charging her as removable under section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an alien not in possession of a valid immigration document. She admitted the allegations before an IJ on May 5, 2000, and requested asylum, withholding of removal, and relief under the CAT.

Ou entered the United States without inspection at Los Angeles International Airport on December 26, 1998. He filed for asylum before an asylum officer on January 10, 2001. The INS served the petitioner with a Notice to Appear on January 24, 2001, charging him as removable under section 212(a)(6)(A) of the INA, 8 U.S.C. § 1182(a)(6)(A), as an alien neither admitted nor paroled after inspection by an immigration officer. Ou admitted the allegations before an IJ on March 4, 2002. Although Ou filed for asylum after the one year statutory period had expired, *see* 8 U.S.C. § 1158(a)(2)(B), the IJ deemed his application timely because it was consolidated with Ren's timely application.

Although, as discussed below, Ren's and Ou's accounts of the events underlying their asylum applications differ in some respects, they agree on the following facts. Ou was born on October 20, 1971, and Ren was born on February 18, 1972, in Fuzhou City, China. They married on April 17, 1995, and gave birth to their daughter on September 11, 1995. About seven months later, government officials forced Ren to have a contraceptive Intra–Uterine Device ("IUD") inserted, which caused pain in her abdomen. In June, 1997, she hired a private physician to remove the IUD, because she wanted another child and doing so was prohibited by China's one-child policy. She then went to live with her aunt. In April, 1998, Ren became pregnant again. In November, 1998, birth control officials somehow discovered her and forced her to go to a hospital and have an abortion. She stayed at the hospital for two days, then hired a taxi and went to her mother's house.

She stayed at her mother's house for about a month before she learned from a neighbor, whose husband worked for the government and "overheard something," that the authorities wanted to sterilize her. The neighbor told her that the government would send her a written notice to go to a hospital, and she received this notice but subsequently lost it.

To avoid sterilization, Ren went to hide at her uncle's house in another province. Shortly after Ren arrived at her uncle's

---

**2.** In March 2003, the relevant functions of the INS were transferred into the new Department of Homeland Security and reorganized into the Bureau of Immigration and Customs Enforcement. For simplicity, we refer to the agency throughout this opinion as the INS.

house, Ou left China for the United States. Ren stayed at her uncle's house for about a year before obtaining the money to pay smugglers to take her out of China to the United States.

During the hearing before the IJ, the IJ insisted on obtaining hospital records to corroborate petitioners' account of the forced abortion and continued the proceedings for that purpose. When the hearing resumed, petitioners admitted that they were unable to obtain hospital records confirming Ren's stay at the hospital. Instead of hospital records, they submitted a letter from Ou's father describing his efforts to obtain the records and also submitted unauthenticated hospital certificates indicating that Ren had an IUD inserted on April 22, 1996 and had an abortion on November 3, 1998. The IJ deemed these submissions unreliable. Consequently, he found that petitioners failed to present "any credible evidence to support [their] testimony" and denied petitioners' applications for asylum, withholding of removal, and relief under the CAT.

On May 5, 2004, the BIA affirmed, holding that petitioners' "testimony and evidence lack sufficient consistency and plausibility to provide a coherent account of the events allegedly resulting in their fear of return to China." The BIA found it "troubling that the lead respondent and her husband provided inconsistent testimony regarding matters at the heart of their asylum claim" and supported that conclusion with two examples of such inconsistencies. The BIA further was "unable to find that the [petitioners] have a well-founded fear of persecution based upon the birth of their citizen child" because implementation of the population control law with respect to children born outside of China varies case by case and, at most, amounts to fines on the parents. The BIA further found that because respondents failed to meet the burden necessary to establish their eligibility for asylum, they had also failed to satisfy the higher standard required for withholding of removal or relief under the CAT. This appeal followed.[3]

In order to establish eligibility for asylum, petitioners bear the burden of demonstrating that they are "refugees." *See* 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 208.13(a). The term "refugee" means any person who is outside of their home country and "is unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. § 1101(a)(42)(A). A 1996 amendment to the definition of "refugee" added that

> a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well-founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well-founded fear of persecution on account of political opinion.

*Id.*

Petitioners may meet their burden of demonstrating refugee status by showing

---

**3.** The recent amendments to the INA, 8 U.S.C. §§ 1158(b) and 1252(b)(4), enacted by the Real ID Act of 2005, Pub. Law No. 109–13, concerning corroboration and credibility determinations, are not applicable to this case because those provisions apply only to asylum applications made on or after May 11, 2005. Real ID Act, § 101(h)(2).

past persecution—which creates a rebuttable presumption that persecution will continue, *Guzmán v. INS*, 327 F.3d 11, 15 (1st Cir.2003) (citing 8 C.F.R. § 208.13(b)(1))— or a well-founded fear of future persecution on account of one of the five statutory grounds. 8 C.F.R. § 208.13(b)(1). To establish past persecution, petitioners must show that they were targeted on any of the five grounds. *See Fesseha v. Ashcroft*, 333 F.3d 13, 18 (1st Cir.2003). If an applicant fails to carry his burden in establishing past persecution, the applicant may nevertheless establish a well-founded fear of future persecution by demonstrating that this fear is "both genuine and objectively reasonable." *Aguilar–Solís v. INS*, 168 F.3d 565, 572 (1st Cir.1999). To satisfy the objective reasonableness prong, an applicant's testimony alone may be sufficient, but it must constitute credible and specific evidence of a reasonable fear of persecution. 8 C.F.R. § 208.13(a); *El Moraghy v. Ashcroft*, 331 F.3d 195, 203 (1st Cir.2003).

We review decisions of the BIA under the substantial evidence standard, *Mihaylov v. Ashcroft*, 379 F.3d 15, 17 (1st Cir. 2004), upholding the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elías–Zacarías*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). *See also* 8 U.S.C. § 1252(b)(4)(B)(2000) ("[t]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). We review the BIA's decision based on the entire record, not merely the evidence that supports the BIA's conclusions. *Gailius v. INS*, 147 F.3d 34, 44 (1st Cir.1998).

Both the IJ's and the BIA's conclusions that petitioners failed to satisfy their burden of proving past persecution seemingly rested, at least in part, on adverse credibility determinations. The IJ's decision relied even more clearly on the lack of corroborating evidence; this could be read as inconsistent with the regulations, *compare* 8 C.F.R. § 208.13(a) ("[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration") or simply as part of a fact-specific determination that the petitioners were not credible and this was underscored, rather than rescued, by lack of corroborating evidence that might reasonably have been expected.

However this may be, the BIA seemingly viewed the immigration judge as relying in part on petitioner's lack of credibility and it sustained the denial of asylum based solely on an alleged lack of credibility due to supposed inconsistencies in the petitioners' stories. Our review of findings is deferential, *Aguilar–Solís*, 168 F.3d at 571, especially as to credibility, but deference is not unlimited especially where we are concerned with reasoning rather than demeanor evidence, *Cordero–Trejo v. INS*, 40 F.3d 482, 487 (1st Cir.1994).

Here, the BIA gave two examples of purported inconsistencies in petitioners' testimony. First, it noted that Ren testified that she believed that birth control officials found her because her aunt's neighbor had reported to them that she was pregnant with a second child. Ou, however, testified that the officials looked for Ren because she had missed her IUD check-up. Second, the BIA contrasted Ren's testimony that her husband was out of town when she was in the hospital and never visited her there with Ou's testimony that he did in fact visit his wife in the hospital but she was unconscious at the time.

It is far from clear to us that these two examples do represent inconsistencies. Ren was only stating her own belief as to why the officials were searching (assuming

they were) and the search may have had more than one impetus. As for the visit to the hospital, Ou's own description provides a reason why his wife might not have known of the visit. Further, neither of these alleged inconsistencies seem to us to go to the "heart of the asylum claim," *Bojorgues–Villanueva v. INS*, 194 F.3d 14, 16 (1st Cir.1999) (internal quotation marks and citations omitted)—although neither are they entirely unrelated to it. Thus far, we are not persuaded that the BIA has provided a rational foundation for affirming the immigration judge solely because of supposed inconsistencies of importance to the case.

We cannot say that the evidence in this case compelled the IJ or the BIA to credit petitioners' account. The lack of any authenticated documents may in particular circumstances create real suspicions; even slight inconsistencies in stories may give rise to further doubts; Ren apparently gave a false name on entering the United States; and the IJ could have made findings based on demeanor evidence. The opportunities for dishonesty, including the forging of documents, is patent and INS has to make hard judgments where the evidence is largely within the control of petitioners and self-serving testimony or letters can be easily produced. Quite possibly a more careful analysis of the record or a further hearing might support a determination that past persecution has not been proved.

Nevertheless, while there is no "presumption" that witnesses are to be believed, the story in this case was detailed and by no means implausible. Unauthenticated hospital certificates were produced supporting the IUD and abortion incidents, the IJ did not say that those documents appeared to have been forged, and it is not hard to imagine why authenticated records might be hard to obtain. And, the

credibility determinations, so far as explained by the BIA, seem to rest on doubtful inconsistencies on marginal matters. We do not think that the BIA ruling can be upheld on the grounds given for it and are obliged to remand for further proceedings. *Gailius*, 147 F.3d at 44.

The petitioners can prevail even in the absence of past persecution by showing an honest and objectively reasonable belief in future persecution. In this case, petitioners gave two different reasons for believing that they would be persecuted if they were returned to China: as punishment for evading the one-child policy by Ren's removing the IUD and becoming pregnant while in China and by having a second child while in the United States.

The first ground we put to one side because it depends on whether the petitioners' story of past persecution is to be believed and that remains an open issue. But so far neither the IJ nor the BIA has suggested doubts as to petitioners' claim that they had a second child in the United States. The BIA found tersely that State Department documents indicated no clear basis for fearing persecution where a Chinese couple had a second child in a foreign country and then returned to China. Petitioners say that they could have a well-founded fear of persecution even if there were only a possibility that they would be persecuted for having a second child outside of China.

We think that simply referring abstractly to the possibility of persecution is not enough to overcome even so terse a reliance on State Department documents as that invoked by the BIA. There might be circumstances in this case for explaining why the State Department documents are not fully on point or showing that petitioners' supposed conduct as a whole made them especially vulnerable to punishment on their return, but no such arguments are

developed on this appeal. Under these circumstances, we are not prepared to overturn the BIA's treatment of future persecution in the absence of a showing that petitioners did undergo the tribulations that they described—which remains unsettled on this record.

For the reasons stated above, the BIA's order is vacated and the case remanded for further proceedings consistent with this opinion.

***Vacated and Remanded.***