# United States Court of Appeals
## For the First Circuit

No. 02-2227

JULIO CESAR QUEVEDO; MEGDY PEREZ DE QUEVEDO,

Petitioners,

v.

JOHN ASHCROFT, Attorney General,

Respondent.

ON PETITION FOR REVIEW OF ORDER

OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Lipez and Howard, <u>Circuit Judges</u>.

<u>Harvey Kaplan</u>, <u>Ilana Greenstein</u>, <u>Maureen O'Sullivan</u>, <u>Jeremiah Friedman</u>, and <u>Kaplan, O'Sullivan & Friedman, LLP</u>, were on brief for petitioners.

<u>Robert D. McCallum, Jr.</u>, Assistant Attorney General, <u>Norah Ascoli Schwarz</u>, Senior Litigation Counsel, and <u>John C. Cunningham</u>, Senior Litigation Counsel, Office of Immigration Litigation, were on brief for respondent.

July 17, 2003

**LYNCH**, **Circuit Judge**.  Petitioner Julio Cesar Quevedo ("Quevedo") is a Guatemalan native and citizen who entered the country in 1991 and who applied for asylum in 1996 based on both past persecution and a fear of future persecution, arising from his membership in an agrarian cooperative in Guatemala.  His wife, Megdy Perez de Quevedo, who entered illegally in 1993, also applied for asylum.  It is conceded that her asylum status is dependent on her husband's.  An Immigration Judge found that Quevedo had suffered past persecution, but denied his asylum application because of the insignificance of that persecution when viewed in light of the changed country conditions in Guatemala following the 1996 peace accord.  The Board of Immigration Appeals affirmed the IJ's decision, using the summary affirmance procedure.  See 8 C.F.R. § 1003.1(e)(4) (2003) (formerly designated § 3.1(e)(4)).  Quevedo petitions for review of the denial of asylum.  We affirm the denial.

## I.  Facts

Quevedo entered the United States in California on August 5, 1991, without undergoing an immigration inspection.  At that time, he was 23 years old.  His now-wife Megdy entered at the same location and in the same manner on or about June 10, 1993.  They were married in Waltham, Massachusetts on April 29, 1996.  Quevedo applied for asylum on May 8, 1996.  Quevedo sought asylum "because of [a] problem with guerrilla warfare in Guatemala" and

because he was "beaten and abused by these people." If forced to return to Guatemala, he felt he "would be killed." On September 25, 1996, following an asylum interview, the INS issued an order to show cause to Quevedo, alleging he was deportable.

Quevedo conceded deportability, but requested asylum and withholding of deportation. At a hearing before the IJ on April 10, 1998, Quevedo said that in Guatemala he lived in a town called Las Trochas in the Nueva Concepcion region, along with his siblings. Las Trochas is a remote mountain town over three hours away from Guatemala City, the capital, by bus. Quevedo was active in a rural farmers' cooperative, and one of his brothers worked for the government.

Quevedo testified that people around him had been affected by Guatemala's civil war. One of his neighbors and four friends of his parents disappeared; he thought it was at the hands of the authorities. One of the members of his cooperative was killed during an attempted abduction in 1989. His sister-in-law's husband also disappeared.

One night in 1990, a group of 15 or 20 individuals came to Quevedo's house at night and demanded to be let in. They threatened to kill Quevedo if they were not allowed inside. Quevedo let them in, and they interrogated him about any contacts he might have with the government. Quevedo said he did not know anyone in the government, but then the intruders found a photo of

-3-

his brother in a uniform, and started beating Quevedo and his brothers. Quevedo and his brothers were tied up, and one intruder threatened to cut Quevedo's throat with a knife. Quevedo was hit in the stomach and the chest. The intruders demanded arms and told Quevedo and his family that they should collaborate with the anti-government struggle. Megdy, who was pregnant at the time, was pushed to the floor when she insisted on remaining with him. Quevedo said the intruders identified themselves both as members of the army and of FAR, one of the guerrilla groups active in Guatemala. After about 15 minutes the group left. Quevedo later discovered that they had visited other houses in his neighborhood that night. No one from Quevedo's family went to a hospital afterwards, nor did they report the incident to the police.

Quevedo left Guatemala the year after the incident; he said he left as soon as he had enough money to go. He joined an older brother -- the brother who had worked for the Guatemalan government -- in Waltham.[1] Quevedo's wife remained in Guatemala with her parents because she was pregnant at the time; she came to

_____

[1] His brother is covered by the so-called "ABC settlement" program which provides for an amnesty for Salvadorans and Guatemalans present in the United States as of September 19, 1990 and October 1, 1990 respectively. The ABC settlement arose out of a class action suit filed on behalf of Salvadoran and Guatemalan nationals. Am. Baptist Churches v. Thornburgh, 760 F. Supp. 796 (N.D. Cal. 1991); see Bureau of Citizenship and Immigration Services, The American Baptist Churches v. Thornburgh (ABC) Settlement Agreement, at: http://www.bcis.gov/graphics/ services/residency/abc.htm. Because of the date of Quevedo's arrival, he is not eligible for the ABC program.

the United States to join him two years later. Quevedo's two younger children (both U.S. citizens) live with him in Massachusetts, his two older children live with his mother-in-law in Guatemala. Quevedo's mother and his three sisters also live in Guatemala. He testified that his sisters and mother moved away from Las Trochas, some to a communal farm about two hours away in another region and some about one-half hour away in the same region. None of them has suffered any persecution since Quevedo left. Quevedo's wife also testified that her family had had no problems in Guatemala.

Quevedo was asked about the peace treaty between the government and the rebels in 1996. He responded by saying that he did not believe in the peace "[b]ecause with a paper and a pencil there is never going to be peace in one country, because there was always violence and now more." Quevedo also said that he knew from the news that "there w[ere] 10 killings every day [in Guatemala] and armed robberies and kidnappings."

The government introduced country condition reports describing then-recent conditions in Guatemala. According to a 1997 State Department report on Guatemala, the 36 year-old civil war in Guatemala had been brought to an end in December 1996 by a peace accord between the government and the guerrillas. Demobilization of the guerrillas was completed by May, the size of the government's military was reduced, legal reforms were enacted

to protect human rights, and a United Nations monitoring group was sent to Guatemala to verify compliance with the accord. While some instances of abuses by government personnel and extrajudicial killings continued to be reported, and while difficulty was encountered in resolving instances of pre-accord persecution, there was "significant improvement in the overall human rights situation." Only one incident of disappearance at the hands of non-governmental forces was linked to politics.

The government also introduced a 1996 State Department profile on Guatemala which noted that the group mentioned by Quevedo, FAR, was part of the umbrella guerrilla group that signed the peace accords. The earlier profile also concluded that the conflict was localized and individuals fleeing guerrilla or governmental harassment are "generally . . . able to find peaceful residence elsewhere in the country, although internal relocation may be more difficult for Indians."

The IJ issued a ruling on April 10, 1998. She found that Quevedo had established past persecution on account of his membership in a particular social group. The IJ noted the information provided by the government regarding conditions in Guatemala since the 1996 peace accord, and the fact that Quevedo's relatives in Guatemala had been able either to relocate or to continue living in the same region without being harmed. She also commented that it did not appear that anyone in his family had been

targeted for reprisals because of a refusal to support the guerrillas.  She concluded that despite the history of persecution of agrarian reform movements in Guatemala,

> [I]t does not appear to this Court that there is any evidence that the respondent would become a victim of such violence if he were to return at this time under current conditions.  Given that the one inciden[t] of persecution that he endured in the past appears to have been of a short duration, did not lead to any other acts of recrimination and did not in fact cause him to depart his country for at least a year and a half after the incident occurred, I find insufficient evidence to warrant a finding of either well-founded fear of persecution in light of changed conditions or that the past persecution was so extreme as to warrant a grant, notwithstanding the changed conditions.

The IJ denied asylum and withholding of deportation, but granted voluntary departure within 120 days, in consideration of the length of time the Quevedos had resided in the United States and their children's status as U.S. citizens.

Quevedo and his wife timely appealed the IJ's ruling to the BIA.  They did not submit any additional evidence, apart from a reference to a <u>Boston Globe</u> article regarding the murder of Bishop Conedera in April 1998, which was thought to be an act of revenge for the Bishop's partisanship during the civil war.  No more recent country reports were submitted.  On September 13, 2002, the BIA affirmed without opinion the result of the IJ's decision,

and granted voluntary departure within 30 days. Quevedo now petitions for review of this decision.[2]

## II.  Analysis

The BIA's determination must be upheld if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotation omitted). A court may reverse "only if the evidence presented by [petitioner] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." Id.; accord El Moraghy v. Ashcroft, 331 F.3d 185, 202 (1st Cir. 2003). Merely identifying "alternative findings that could be supported by substantial evidence" is not sufficient to supplant the agency's findings. Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). When the BIA summarily affirms the IJ's opinion, as here, the court reviews the decision of the IJ. Herbert v. Ashcroft, 325 F.3d 68, 71 (1st Cir. 2003); Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003).

The petitioner bears the burden of establishing eligibility for asylum by proving that he qualifies as a refugee. 8 U.S.C. § 1158(b)(1) (2002); 8 C.F.R. § 208.13(a). A petitioner

---

[2]    The Attorney General has been substituted for the Immigration and Naturalization Service as respondent. See Fesseha v. Ashcroft, No. 02-2047, 2003 WL 21374082 at *3 n.5 (1st Cir. June 16, 2003); 8 U.S.C. § 1252(b)(3)(A) (2000).

-8-

can do so by two routes: "(1) by demonstrating past persecution, thus creating a presumption of a well-founded fear of persecution; or (2) by demonstrating a well-founded fear of persecution." Yatskin v. INS, 255 F.3d 5, 9 (1st Cir. 2001) (citing 8 C.F.R. § 208.13(b)). A finding of past persecution requires that an applicant demonstrate that he has suffered persecution on one of the five enumerated grounds: race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13(b)(1). To establish a well-founded fear of future persecution, applicants can either offer specific proof, or they can claim the benefit of a regulatory presumption based on proof of past persecution. Guzman v. INS, 327 F.3d 11, 15 (1st Cir. 2003) (citing 8 C.F.R. § 208.13(b)(1)); Velasquez v. Ashcroft, 316 F.3d 31, 35 (1st Cir. 2002) (same).

Once an applicant "has been found to have established such past persecution," he or she "shall also be presumed to have a well-founded fear of persecution on the basis of the original claim." El Moraghy, 331 F.3d at 203 (citing 8 C.F.R. § 208.13(b)(1)); Fergiste v. INS, 138 F.3d 14, 18 (1st Cir. 1998). That presumption can be rebutted by an IJ's finding by a preponderance of the evidence either (1) that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality," or (2) that "[t]he applicant could avoid

future persecution by relocating to another part of the applicant's country, . . . and under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(1)(i)(A)-(B).

Evidence from the government about changed country conditions does not automatically rebut the presumption. Such evidence is often general in nature and may not be an adequate response to an applicant's showing of specific personal danger. Gailius v. INS, 147 F.3d 34, 36 (1st Cir. 1998). "[C]hanges in country conditions must be shown to have negated the particular applicant's well-founded fear of persecution." Fergiste, 138 F.3d at 19. Here, the IJ's opinion engaged in the required individualized analysis: the IJ looked to the treatment of members of Quevedo's family who have remained in Guatemala, as well as to the severity and duration of the persecution suffered by Quevedo. We add that Quevedo's persecution by the guerrillas was also shared by his neighbors; he was not singled out.

Petitioner argues that information contained in the State Department report submitted by the government does not support the IJ's finding, but rather is evidence of continuing persecution. The 1997 report supports a finding of changed country conditions, however. The Supreme Court evaluated the 1997 State Department report in INS v. Ventura, 123 S. Ct. 353 (2002) (per curiam). The Court rejected the Ninth Circuit's interpretation that the report

compels a finding of insufficiently changed circumstances; instead, the Court pointed out that "[t]he bulk of the report makes clear that considerable change has occurred," even though some parts could be read to the contrary. Id. at 356. Furthermore, the Court noted, the report also makes clear that only high-level leaders would be vulnerable to political harassment, and even they could escape such persecution by relocating within Guatemala. Id. The report is not required to be read in petitioner's favor. This Circuit has rejected the contention that pervasive non-political criminality in Guatemala constitutes a basis for asylum. Oliva-Muralles v. Ashcroft, 328 F.3d 25, 27 (1st Cir. 2003).

The IJ reasonably found that the agency met its burden to rebut the presumption of fear of persecution through changed country conditions. Petitioner was also entitled to respond to the IJ's finding of changed country conditions. See Gailius, 147 F.3d at 45; 3 C. Gordon, S. Mailman & S. Yale-Loehr, Immigration Law and Procedure § 33.04[3][f], at 33-52.21 to 33-52.23 (2003). Quevedo has signally failed to do so. He did not submit more recent country condition reports, nor did he solicit testimony from experts, nor did he present evidence that similarly situated individuals continued to face persecution. Instead, his appeal to the BIA contained only a reference to the assassination of Bishop Conedera. While the Bishop's death supports the claim that conditions in Guatemala are not completely settled, it does little

to confirm petitioner's argument that apolitical members of agrarian cooperatives face continued dangers. Indeed, on the contrary, it tends to confirm the State Department's conclusion that only those in leadership positions are likely to be targets of persecution.

Petitioner argues that the finding of past persecution alone is enough to warrant asylum even with changed country conditions. Under certain limited circumstances this can be true. "[A]n applicant may be afforded asylum even where the evidence establishes such a change in conditions that he or she may be found to no longer have a well-founded fear of persecution. Compelling reasons arising out of the severity of the past persecution suffered may be found . . . ." In re H-, 21 I. & N. Dec. 337, 346-47 (BIA 1996) (citations omitted); see also 8 C.F.R. § 208.13(b)(1)(iii)(A). However, Quevedo's experience in Guatemala, while undoubtedly terrifying, does not rise to the level of severity necessary for a court of appeals to set aside the agency's conclusion. As the IJ noted in her analysis, it was only a single incident of persecution, of a short duration, and was not followed by acts of recrimination.

Agency regulations also provide for discretionary grants of asylum where an applicant has been found to have suffered persecution but country conditions have subsequently changed when "[t]he applicant has established that there is a reasonable

possibility that he or she may suffer other serious harm upon removal to that country."  8 C.F.R. § 208.13(b)(1)(iii)(B). Bearing in mind the Supreme Court's discussion that a "reasonable possibility" of future harm could be met by as little as a one in ten chance, INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987), we find that the IJ's decision was supported by substantial evidence. The record does not support even a "reasonable possibility" of future persecution.  Quevedo also argues that the IJ erred in not separately considering the issue of well-founded fear of future persecution (independent of past persecution) and in applying the wrong legal standards.  Neither contention has merit.  We affirm the denial of asylum.

Quevedo's withholding of deportation claim necessarily fails.  Withholding is only mandatory when an alien presents "evidence establishing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds."  INS v. Stevic, 467 U.S. 407, 429-30 (1984).  As the withholding of deportation standard is more difficult to meet than the asylum standard, "a petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy the former." Fesseha v. Ashcroft, No. 02-2047, 2003 WL 21374082, at *4 n.6 (1st Cir. June 16, 2003) (citation omitted).

III.

The decision of the BIA is **affirmed**.  The BIA's grant of voluntary departure within 30 days is reinstated.  <u>See</u> <u>Yatskin</u>, 255 F.3d at 11.