**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

---

No. 02-2532

GEORGES MRAD BACHIR,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER OF

THE BOARD OF IMMIGRATION APPEALS

---

Before

Boudin, <u>Chief Judge</u>,
Stahl, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

---

<u>Joseph L. Grimaldi</u> on brief for petitioner.
<u>Peter D. Keisler</u>, Assistant Attorney General, <u>Allen W. Hausman</u>, Senior Litigation Counsel, and <u>Aviva L. Poczter</u>, Attorney, Office of Immigration Litigation, on brief for respondent.

---

July 16, 2004

---

**Per curiam.** Petitioner-appellant Georges Mrad Bachir, a Lebanese national, appeals from the Board of Immigration Appeals' order denying his petition for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] We affirm the BIA's decision.

## I. BACKGROUND

Bachir is a native and citizen of Lebanon. On November 13, 1998, he arrived via airplane in the United States and immediately requested asylum. Through an interpreter, he provided a sworn statement to an INS officer saying that he came to the United States to live in a free country and to escape police brutality in Lebanon. Bachir also stated the following: he had been forced to continue to serve in the Lebanese Army after completing his required year of service. On one occasion, he was "arrested by the Lebanon military to obtain military secrets from the Christian Lebanon army." He came to the U.S. via Cyprus and London; he did not seek asylum there because the U.S. was his ultimate destination. He stated that "America will help everyone."

In response to the INS officer's questioning, Bachir stated that at one time, he was ordered (presumably by the Lebanese Army) to put bombs in cars and would have been in trouble had he

---

[1] On appeal, Bachir presses only his asylum claim. Consequently, we treat his withholding and CAT claims as waived. See, e.g., Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 679 (1st Cir. 1996).

disobeyed the order. He said that he had problems in Lebanon because of his religion – "Christian Morony" – and that "they want me to be in the Christian army to fight against the Israelis."[2] He also mentioned to the immigration officer that he had traveled to the U.S. in the company of two friends.

On November 27, the INS filed a Notice to Appear in immigration court, charging him with removability pursuant to section 212(a)(7)(A)(i)(I) of the Immigration and Naturalization Act, as an immigrant not in possession of a valid entry, travel, or identity and nationality document. 8 U.S.C. § 1182(A)(7)(A)(i)(I). Following a hearing, petitioner admitted he was subject to removal from the United States and filed an application for asylum, withholding of removal, and CAT protection.

Bachir testified before the Immigration Judge as follows: before he left Lebanon, he lived in Amsheet with his mother and his two brothers. He worked as a truck driver for a private company. In November 1995, at the time that Lebanon's president announced that his term would be extended and that elections would be cancelled, Bachir participated in a protest. Later that night, soldiers knocked on his door and pushed his mother aside. When he

---

[2]Later, at the hearing before the immigration judge, Bachir said that he had not understood the interpreter at the initial immigration interview. He denied making the statements that "America will help everyone"; that he was wanted for service in a Christian army to fight Israel; and that he was forced to continue to serve in the Lebanese army after his service was completed.

identified himself, soldiers punched him and hit him with a rifle butt. They then tied his hands and put him in the trunk of a car. He was taken to a building where he was held for sixteen days. During that time, Bachir claimed, he was hit for refusing to divulge the identities of other protestors, doused with cold water, fed only bread, and denied toilet facilities.

Bachir also testified that during municipal elections in 1996, soldiers came to his home, took him away and detained him for five days. During the period he was detained, he was not beaten. In 1998, again during municipal elections, soldiers also detained him in order to prevent him from voting.

On November 10, 1998, Bachir was asked by "Syrians" and "members of Hezbollah" to deliver boxes of what he assumed to be munitions to southern Lebanon. Lebanese army soldiers dressed in Syrian uniforms, aided by his employer, loaded boxes onto his truck; when Bachir protested, he was struck with a rifle butt and accused of being a traitor who deserved to be killed. Although afraid, he drove his truck to an Israeli army checkpoint, followed by an Army jeep. Bachir testified that he had been told that he would receive a cell phone call when he reached a place called Marjyoun to arrange for the delivery of the boxes. After successfully passing through the Israeli checkpoint, with the soldiers no longer able to see him, he dumped the boxes off a mountain road and fled to Beirut. He said he did so because

delivering the boxes was against his principles; he wanted Lebanon to be free of Hezbollah and the Syrians.

Next, Bachir called a cousin, who was an army commandant, and told him what had happened. He testified that his cousin directed him to meet him at the Beirut airport, where he gave him his passport and cash, along with instructions to go to Cyprus.[3] When Bachir reached Cyprus, his cousin told him via telephone that the army wished to kill Bachir.

On November 11, 1998, while Bachir was in Cyprus, a man named Abou George purchased an airline ticket for Bachir to travel from Cyprus to London.[4] Bachir's passport contained a visa for travel to Panama, also obtained on November 11. Bachir stated that he does not know how he obtained the visa; he stated that George had his passport for several hours on that day. George also purchased an airline ticket for Bachir to travel from Panama to Miami, Florida.[5] Bachir further testified that he intended to remain in London, but his request for amnesty was not understood and he was placed on a plane to Miami.

---

[3]Bachir had applied for and obtained a passport some time after his detentions and before November, 1998.

[4]He asked George to help him file a refugee application in Cyprus, but, after consulting with an attorney, George told him that Cyprus does not accept such applications.

[5]Contrary to Bachir's testimony, the tickets were dated November 9, 1998, the day before Bachir claims the incident involving the boxes took place. At the hearing, Bachir could not explain this discrepancy.

At the time of the hearing before the IJ, Bachir's mother and brothers continued to reside in Amsheet without incident. Bachir had purchased a home in Amsheet four or five months before leaving Lebanon and had never attempted to relocate after any of his encounters with the authorities. He further stated that he served in the army from November 1996 to November 1997, and was not ordered to serve again after his discharge.

Walid Phares, a professor of political science and Middle East Studies at Florida Atlantic University testified on Bachir's behalf as an expert witness. By way of background, Phares explained that since 1990, Syria has been present in Lebanon, and that Syrian intelligence is authorized to operate in Lebanon, to make arrests there, and to transfer detainees to Syria.

Significantly, Phares stated that he did not know Bachir before the instant case. He had no independent information corroborating the specifics of Bachir's contentions, and based his opinion solely on what Bachir told him. Phares testified that if Bachir's account was true, it would be consistent with conditions in Lebanon. He also opined that Bachir would be likely to be arrested upon returning to Lebanon and be accused of being a traitor or collaborator.[6] There have been reports of the torture of detainees by both Syrian and Lebanese intelligence services.

_____

[6]Phares testified that the Syrian intelligence service would be aware that Bachir had applied for asylum in the United States.

-6-

The IJ denied the petition, finding that Bachir was not a credible witness and had failed to meet his burden of demonstrating a well-founded fear of persecution. Bachir appealed from the IJ's decision to the BIA. On October 31, 2002, the BIA affirmed the IJ's decision without a separate opinion. This appeal followed.

## II. DISCUSSION

We review the Board's findings of fact and credibility under a "substantial evidence" standard. Mediouni v. INS, 314 F.3d 24, 26 (1st Cir. 2002) (citing Yatskin v. INS, 255 F.3d 5, 9 (1st Cir. 2001)). "Board determinations of statutory eligibility for relief from deportation, whether via asylum or withholding of deportation, are conclusive if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Id. at 26-27 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 480 (1992)). Unless the applicant puts forth evidence "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution," we will uphold a denial of asylum. Elias-Zacarias, 502 U.S. at 483-84. When the Board affirms without opinion, as it did here, we review the decision of the Immigration Judge. Quevedo v. Ashcroft, 336 F.3d 39, 43 (1st Cir. 2003).

An asylum applicant bears the burden of proving either past persecution or a well-founded fear of future persecution. Id.; 8 C.F.R. § 208.13(b). To establish past persecution, an

-7-

applicant must demonstrate that he or she has suffered persecution on account of one or more of several enumerated statutory grounds: race, religion, nationality, membership in a social group, or political opinion. 8 C.F.R. § 208.13(b)(1). A determination of past persecution triggers a presumption that the applicant has a well-founded fear of future persecution and provisionally establishes his or her eligibility for asylum. 8 C.F.R. § 208.13(b)(1). The burden then shifts to the Attorney General to demonstrate by a preponderance of the evidence either 1) that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality," or 2) that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality." Id. §§ 208.13(b)(1)(i)(A)-(B).

Accordingly, to establish a well-founded fear of future persecution, the applicant can either claim the benefit of a regulatory presumption based on proof of past persecution or prove "both a genuine subjective fear and an objectively reasonable fear of persecution" on one or more of the statutory grounds. Quevedo v. Ashcroft, 336 F.3d 39, 44 (1st Cir. 2003); see also Mediouni, 314 F.3d at 27. An objectively reasonable fear "requires a showing 'by credible, direct, and specific evidence . . . facts that would support a reasonable fear that the petitioner faces persecution.'"

Civil v. INS, 140 F.3d 52, 55 (1st Cir. 1998) (quoting Ravindran v. INS, 976 F.2d 754, 758 (1st Cir. 1992)).

The standard for withholding deportation is stricter than that for asylum, thus "a petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy the former." Mediouni, 314 F.3d at 27 (quoting Velasquez v. Ashcroft, 305 F.3d 62, 64 n.2 (1st Cir. 2002)). Accordingly, we address Bachir's asylum claim first.

A finding of credibility is paramount in asylum cases. Gailius v. INS, 147 F.3d 34, 45 (1st Cir. 1998). In determining credibility, applicable regulations direct that we weigh the applicant's account of specific incidents "in light of general conditions in the applicant's country of nationality or last habitual residence" to determine if the applicant's testimony is plausible. 8 C.F.R. § 208.13(a) (1997); see Cordero-Trejo v. INS, 40 F.3d 482, 491 (1994). If the IJ chooses to reject a petitioner's testimony as lacking credibility, he must "offer a specific, cogent reason for [the IJ's] disbelief" with support in the record. El Moraghy v. Ashcroft, 331 F.3d 195, 205 (1st Cir. 2003) (internal citation and quotation marks omitted).

Here, the IJ questioned Bachir's credibility on the grounds of inconsistencies and unexplained elements in the record evidence: the discrepancies in his statements to the immigration inspector versus his hearing testimony; the conflicting accounts of the relevant dates; how the Panamanian visa came into Bachir's

-9-

possession; whether Bachir's true destination was the U.S. or Panama; and the presence and significance of Bachir's traveling companions. Given our deferential standard of review of credibility determinations, <u>Mendes</u> v. <u>INS</u>, 197 F.3d 6, 13 (1st Cir. 1999), we perceive no legitimate basis for reversing the IJ's ruling that Bachir's testimony lacked the "ring of truth."

In light of the IJ's credibility finding, we affirm his conclusion that the incident in which Bachir was asked to deliver boxes just before he left Lebanon does not establish persecution. The IJ found that the authorities' interest in Bachir "was that he was able to travel to a particular area and they saw his usage in delivering the material they wanted delivered," rather than to single him out based on political animus. The record provides sufficient support for that finding such that we will not disturb it.

The IJ did not specifically take issue with the credibility of Bachir's account of his episodes of detention from 1995 to 1998.[7] Given that at least one episode followed immediately on the heels of Bachir's participation in a political protest and included physical abuse, such evidence conceivably could, under some circumstances, support a finding of past

---

[7]Rather, it appears that the IJ concluded that the detentions did not constitute past persecution, citing the authorities' lack of interest in Bachir's day-to-day business or family activities, Bachir's successful military service following the first detention, and his ability to obtain a passport and travel freely.

-10-

persecution.  See, e.g., Gailius v. INS, 147 F.3d at 143 (petitioner, a native of Lithuania, was active in the protests against Soviet rule).

Nonetheless, under the specific facts of this case, the detentions do not form the basis for an asylum case.  As the IJ points out, Bachir did not mention the detentions in his application for asylum.  Moreover, in his appellate brief, Bachir explicitly disavowed any reliance on those incidents as motivation for his decision to flee Lebanon.  Even if we take the detentions into account, it is not clear that, together with the truck incident, they form a common pattern that was motivated by persecution on account of Bachir's political opinion.  Because we do not conclude that Bachir's evidence was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution," we will uphold the denial of asylum.  Elias-Zacarias, 502 U.S. at 483-84.

Bachir contends that the IJ erred in analyzing his claim as one of religious persecution rather than persecution based on political opinion.  Although the IJ noted in passing that Bachir did not experience religious persecution while serving in the military or suffer more than the same risks than others of his religious beliefs residing in Lebanon, he additionally analyzed Bachir's asylum claim under the rubric of political opinion.

For the foregoing reasons, we **<u>AFFIRM</u>** the denial of Bachir's petition for asylum, withholding of removal, and CAT protection.