# United States Court of Appeals
## For the First Circuit

No. 03-1575

STEFAN ANTONOV MIHAYLOV; and LUDMILA GEORGEVA NAYDENOVA,

Petitioners,

v.

JOHN ASHCROFT, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Lynch, and Lipez, <u>Circuit Judges</u>.

<u>Peter Darvin</u> for appellant.
<u>Hillel R. Smith</u>, Attorney, Office of Immigration Litigation, with whom <u>Peter D. Keisler</u>, Assistant Attorney General, Civil Division, and <u>Terri J. Scadron</u>, Assistant Director, Office of Immigration Litigation, were on brief, for appellee.

August 17, 2004

**LIPEZ**, **Circuit Judge**.    Petitioner Stefan Antonov Mihaylov, a native and citizen of Bulgaria, seeks review of the decision of the Board of Immigration Appeals (BIA) denying his application for asylum.  Petitioner Ludmila Georgeva Naydenova is a derivative asylum applicant.[1]  Mihaylov argues that the evidence presented below compels a conclusion that he was persecuted in the past on account of his political opinion and is therefore entitled to a statutory presumption of a well-founded fear of future persecution.  He further claims that the evidence of changed circumstances offered by the government is insufficient to overcome that presumption and that he is therefore eligible for asylum.

Ordinarily, we review the BIA's decision under our deferential "substantial evidence" standard, upholding that decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992).  In this case, however, we are unable to conduct a proper substantial evidence review of the BIA's decision because neither the BIA nor the Immigration Judge explained with adequate clarity and particularity the grounds

---

[1] Naydenova, Mihaylov's wife, is included in the asylum petition based on Mihaylov's experiences.  While this opinion refers primarily to petitioner Mihaylov, the decision rendered applies to both petitioners.  See 8 U.S.C. § 1158(b)(3)(A).

-2-

for rejecting Mihaylov's past persecution claim. In light of this legally insufficient explanation, see Gailius v. INS, 147 F.3d 34, 44 (1st Cir. 1998), we vacate the BIA's order and remand the case for further proceedings consistent with this opinion.

## I.

In July 1992, petitioners Stefan Antonov Mihaylov and Ludmila Georgeva Naydenova entered the United States without inspection. The petitioners applied for asylum and withholding of removal on May 7, 1993. The Immigration and Nationality Service hearing officer determined that they were ineligible for asylum and withholding, and referred their case to the Immigration Judge. Approximately five years later, on January 27, 1999, the INS issued Mihaylov and Naydenova notices to appear, charging them with unlawful presence in the United States in violation of section 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA). The petitioners conceded the charge but renewed their request for asylum and withholding of removal. They also submitted a petition for relief under the Convention Against Torture (CAT), and requested voluntary departure in the event that removal was necessary.[2] On August 4, 2000, after hearing testimony on the merits of the petitioners' claims, the Immigration Judge denied their applications and entered an order of removal to Bulgaria.

---

[2] Mihaylov does not appeal the IJ's decision regarding his claims for withholding of removal, relief under the CAT, and voluntary departure.

The BIA issued a summary affirmance without opinion on March 28, 2003.[3]  See 8 C.F.R. § 1003.1(a)(7).  This petition followed.

## II.

We summarize the evidence that Mihaylov presented to the IJ and then discuss the IJ's evaluation of that evidence.  Stefan Mihaylov was born in 1962 in Sofia, Bulgaria.  Mihaylov's father was a member of the communist party, but his maternal grandfather, Stefan Todorov Georgiev, was an outspoken critic of Bulgaria's communist regime.  In 1954, the government arrested Georgiev on fabricated murder charges in retaliation for his political activities, and sentenced him to twelve years in prison.  As a result of Georgiev's conviction and sentence, Mihaylov and the other members of his family were stigmatized as anti-communist dissidents and enemies of the Bulgarian government.

By the time that he was thirteen years old, Mihaylov began to have trouble with the communist authorities.  In his last year of elementary school, he spoke out against the Communist Youth League (DKMS), which all secondary school students were expected to join.  Because of his opposition to the DKMS, Mihaylov received low conduct grades, which precluded him from attending his choice of secondary school.  In 1977, the district superintendent of schools ordered Mihaylov to meet with him throughout the year for political

---

[3] Where, as here, the BIA summarily affirms the decision of the IJ, we review the decision of the IJ.  Quevedo v. Ashcroft, 336 F.3d 39, 43 (1st Cir. 2003).

-4-

education lessons. During those sessions, the school official frequently struck Mihaylov and threatened to send him to reform school if he did not cooperate.

On April 17, 1978, when Mihaylov was fifteen years old, a uniformed policeman appeared at the door of his family's apartment and demanded that Mihaylov accompany him to the police station. Without notifying Mihaylov's parents, the policeman took Mihaylov to an unfamiliar detention facility where he was locked up in a small, windowless cell. The cell contained only a bed, a bucket for a toilet, and a lightbulb which stayed on 24 hours a day. On the day of his detention, Mihaylov suffered a loss of consciousness and subsequently lost control of his bodily functions. The prison guard refused to allow him to bathe or clean his soiled clothes and denied his request to see a doctor. Mihaylov was later interrogated by two officials who riduculed him for smelling badly, humiliated him, and compared him to his grandfather. They asked Mihaylov where he had been on certain dates, whether he knew certain people, and whether he was a member of a political group. When his answers did not satisfy them, the officials struck Mihaylov with clubs or their fists on his legs, back, arms, and face.

Mihaylov was detained for six or seven days. During that time, he was interrogated and beaten frequently and was not allowed to wash or change his clothes. On two occasions, he was denied

access to a toilet. Mihaylov again requested to see a doctor, and again that request was refused. On April 24, Mihaylov was ordered to sign a document stating that he had not been harmed, beaten, or subjected to force in any way while in custody, and that he had been held only for interrogation. He was then taken by van to a local Sofia police station and was released.

In the weeks following his detention, Mihaylov's physical condition deteriorated. He began to lose sensitivity through the lower part of his body and eventually was unable to walk. He was diagnosed with acute inflammation of the nerves of his spinal cord and spent a month in the hospital and three more months in a rehabilitation center. He eventually regained his ability to walk with a cane, but remained permanently disabled.

In the years following his arrest, Mihaylov was frequently harassed by government officials He was arrested more than ten times for minor "offenses" such as wearing long hair, blue jeans, and a crucifix; ordered to pay fines because of his appearance; and forced to sign an agreement to stay away from downtown Sofia. On one occasion, Mihaylov was arrested and detained on suspicion of dealing in foreign currency.

In 1989, Mihaylov was detained by a government security agent, Hristo Rachev, who questioned him about his visits to the United States Embassy and referred to Mihaylov's prior detentions. Rachev threatened to have Mihaylov imprisoned on false charges if

he did not agree to become a government informant. Mihaylov reluctantly agreed, and he met with Rachev about 30 times over the next year. During those meetings Rachev asked Mihaylov to identify pictures of individuals and to provide information about political activities and specific people. Mihaylov grew increasingly afraid for his safety. On January 30, 1990, he fled Bulgaria with Naydenova, who was by then his wife, and traveled to Canada. He applied for asylum, but that application was denied. Mihaylov and Naydenova then entered the United States on July 12, 1992.

In her supporting testimony, Naydenova stated that after she began to live with Mihaylov, she was repeatedly warned by security officials and threatened with the loss of her job at the Ministry of Culture if she continued to associate with him because he was from a "bad family." She explained that both her family and Mihaylov's were anti-communist and were mistreated by the communist party, and noted that being anti-communist was like a "sticker" on one's back that follows you for the rest of your life. She described an unsettling phone call to her home in which a man demanded to know where Mihaylov was and ordered her to tell him that "his friend Hristo Rachev called." When Naydenova gave her husband the message, he began shaking uncontrollably. Later that year, Mihaylov and Naydenova were rounded up as part of a mass detention in a particular section of town. Naydenova explained that she and her husband were pulled out of a group at the police

station and ushered into an office, where she was introduced to Rachev, whose name and voice she recognized. Mihaylov and Rachev engaged in a furtive conversation, and the couple was subsequently released.

Mihaylov also submitted numerous documentary sources in support of his past persecution claim. Those sources included the State Department's 1989 Country Report on Human Rights Practices for Bulgaria, which described the harsh repression and widespread human rights abuses of Bulgaria's communist regime prior to its collapse in November 1989, including arbitrary arrest and detention, cruel and unusual treatment and punishment of prisoners, and "prison deaths caused by torture and beatings." Bulgarian laws "provide[d] severe punishment for the voicing of any belief or conviction which [was] contrary to official policy or critical of the State," and "Bulgarians were detained, tried, imprisoned, and exiled for criticism and actions that were political in nature." The report described "the internal security forces which monitored the 'ideological' activities of citizens" and "directed an elaborate system of informers in virtually all workplaces, residential areas, and social organizations to monitor the daily lives of Bulgarians for signs of dissent." Besides the State Department report, the record contains at least sixteen additional documents including a Radio Free Europe report on Bulgaria, scholarly works, and newspaper articles – all of which discuss the

Bulgarian Communist regime's persecution of political dissidents. Mihaylov also submitted an affidavit from his mother, and the jail and character records of his grandfather, which described his grandfather's problems with the communist government and his family's reputation as enemies of the regime.

In a written opinion that included an extensive, twenty-page summary of the applicable record evidence but only two pages of legal analysis, the IJ denied Mihaylov's request for asylum and withholding of removal, concluding that he had failed to establish past persecution or a well-founded fear of future persecution on account of his political opinion or membership in a social group.[4] She explained that Mihaylov "did not establish that the cause of his mistreatment by the former Bulgarian authorities was his or his family's political opinion" or his membership in a social group. With respect to his fear of future persecution, the IJ noted that the communist regime in Bulgaria collapsed in 1989, citing the State Department country reports for Bulgaria for 1997 and 1999. She stated that Mihaylov "failed to offer any evidence that any government agent or other militia member still has any inclination to punish him for his political belief." The IJ further found that Mihaylov "failed to meet his burden in establishing a well-founded fear of <u>future persecution</u> on account of his social group persecution as a family member." (emphasis in the original).

_____

[4] Mihaylov does not argue on appeal that he was persecuted on account of his membership in a social group.

Although the IJ accepted Mihaylov's account of past events, she stated, without elaboration, that "the Court [found] his reasons for the occurrence of th[o]se events not to be credible." She was also troubled by Mihaylov's testimony concerning his use of alcohol, referring to it throughout her opinion and explaining that

> [Mihaylov] presented testimony that must be viewed through the veil of alcoholism, use of other drugs such as Valium, and major depression with anxiety attacks. He repeatedly minimized his use of Valium before this Court when compared with information he gave to Doctor Rines and the female respondent's observations. Further, the amount of alcohol he reported he consumed daily varied widely in amount in his testimony to the Court and in his report to his doctors. The male and female respondents' testimonies concerning the male respondent's drinking were also at variance. The Court notes the oft quoted aphorism that alcoholism is "a disease of denial." The Court, nonetheless, must take his less than forthright report to this Court concerning his addiction to inform his testimony overall.

The IJ also denied Mihaylov's requests for protection under the CAT and for voluntary departure. Mihaylov appealed the IJ's decision to the BIA, which summarily affirmed without opinion.

### III.

We have emphasized the need for clear administrative findings in reviewing the decision of the IJ or BIA. Gailius, 147 F.3d at 46-47. "A reviewing court should judge the action of [the BIA] based only on reasoning provided by the agency, not based on grounds constructed by the reviewing court," Yatskin v. INS, 255 F.3d 5, 9 (1st Cir. 2001), and "that basis must be set forth with

-10-

such clarity as to be understandable," Gailius, 147 F.3d at 46-47. Likewise, "in the case of an adverse credibility determination, the IJ must offer a specific, cogent reason for [her] disbelief." Qin v. Ashcroft, 360 F.3d 302, 306 (1st Cir. 2004) (citation and internal quotations omitted). Thus, we will remand if the agency fails to state "with sufficient particularity and clarity the reasons for denial of asylum" or otherwise to "offer legally sufficient reasons for its decision." Gailius, 147 F.3d at 46-47.

An asylum applicant bears the burden of establishing that he or she meets the statutory definition of a refugee and is therefore eligible for asylum. 8 C.F.R. § 208.13(a). Applicants may meet this burden in one of two ways. First, an applicant qualifies as a refugee if he or she demonstrates a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13(b); El Moraghy v. Ashcroft, 331 F.3d 195, 202-03 (1st Cir. 2003). Alternatively, the applicant is entitled to a presumption of a well-founded fear of persecution if he or she establishes past persecution on account of one of the five statutory grounds. 8 C.F.R. § 208.13(b)(1); Yatskin, 255 F.3d at 9.

In the present case, the IJ did not reject Mihaylov's claim that he was persecuted. Rather, she concluded that he failed to demonstrate that the persecution was on account of his political

opinion. She offered only one specific reason in support of this ruling, stating that Mihaylov admitted that he may have been detained in 1972 for an ordinary crime rather than for his political opinion:

> [A]lthough the male respondent claims he was initially detained because he was targeted for his political opinion, he later admitted that the police searched the family's home and that there may have been a criminal matter involved. In such a case, the police would have been within their authority to detain a suspect . . . .

We do not agree that Mihaylov "later admit[ted]" in the course of his testimony that he may have been detained on suspicion of having committed a non-political crime. Rather, his testimony consistently conveyed his belief that he was detained because of his political opinion. During cross examination, the INS attorney questioned Mihaylov about a potential discrepancy between his testimony and what he told the asylum officer during his initial interview in 1998 about whether he was arrested for a crime or for his political opinion. Although Mihaylov acknowledged that he had told the asylum officer that he was detained because he was suspected of criminal activities, he explained that "in Bulgaria both the political and criminal activities are being called criminal activities."[5] Hence, the IJ's finding that Mihaylov

_____

[5] Mihaylov's explanation was supported by the State Department's 1989 Country Report on Human Rights Practices for Bulgaria, which Mihaylov submitted in support of his asylum application. That report stated that many forms of political dissent were then characterized as crimes under the Bulgarian Penal Code, which prohibited "crimes against the People's Republic, anti-state agitation and propaganda, slander against the State,

-12-

admitted that he may have been detained for a crime relies on a mischaracterization of the evidence and does not provide a legitimate basis for her rejection of his claim of past persecution.

Aside from this unsupportable finding of a discrepancy in Mihaylov's testimony as to the motivation for his detention, the IJ offered no specific reasoning in support of her conclusion that Mihaylov failed to prove that his persecution was on account of his political opinion. That void is particularly troubling in light of the considerable evidence of political persecution that we have summarized above. Although the IJ described Mihaylov's testimonial evidence at some length at the beginning of her opinion, she failed to relate that evidence to her rejection of Mihaylov's past persecution claim. Mihaylov's documentary evidence received even less consideration; while the IJ briefly noted that "[t]he Court received the Amended I-589 and Supporting Documents into evidence," her opinion did not discuss any of the documents submitted with Mihaylov's asylum application, many of which related to the connection between his past persecution and political opinion. Although an IJ need not discuss every piece of evidence produced by an asylum applicant, she must give reasoned consideration to the petition and may not ignore substantial testimonial and documentary

spreading untrue allegations about the Government, and committing acts that create distrust toward the Government." (internal quotations omitted).

evidence.  See Morales v. INS, 208 F.3d 323, 328 (1st Cir. 2000).

Mihaylov's evidence of past persecution was substantial and

important, and the IJ's silence about it does little to assure us

that it was considered.  If Mihaylov's testimony and supporting

documentary evidence are true, he may well have suffered

persecution in the past on account of his political opinion.

The IJ also made an odd credibility finding.

Specifically, the IJ found that while Mihaylov "provided a

consistent, basic skeletal outline of events, including his

detention at age 15, and other encounters, the Court finds his

reasons for the occurrence of these events not to be credible."

(emphasis added).  This finding seems to rest on the premise that

Mihaylov's assertion that he was persecuted because of his

political opinion is itself an evidentiary fact to be credited or

discredited.  Yet Mihaylov does not claim to have personal

knowledge of his persecutors' motives, nor does his theory about

those motives constitute a fact from which the IJ could infer that

Mihaylov was persecuted because of his political opinion.  Hence,

the relevant question is not whether Mihaylov's proffered reasons

for his persecution are credible but whether he has provided "some

evidence . . . , direct or circumstantial" that his persecutors

were motivated, at least in part, by his political opinion.[6]

_____

[6] Here, as is usual in asylum cases, there is no direct
evidence as to why Mihaylov was detained, beaten, harassed, and
forcibly recruited as an informer.  Therefore, the IJ should have
considered whether the objective facts in the record created a

-14-

<u>Elias-Zacarias</u>, 502 U.S. at 483 (emphasis in the original). Therefore, the IJ's adverse credibility finding was misplaced.

Finally, and relatedly, the IJ's opinion is suffused with suggestions that Mihaylov's present use of alcohol and inconsistencies in his testimony concerning that use undermined his credibility as a general matter. Yet, there is no evidence in the record, expert or otherwise, that Mihaylov was an alcoholic, nor did the IJ explain what bearing Mihaylov's alcohol use could have had on the legal issues. Some of the IJ's observations appear to relate to Mihaylov's <u>competence</u> to testify rather than his credibility, notwithstanding that she expressly found that he was a competent witness.[7] Other statements note discrepancies between Mihaylov's testimony concerning his daily alcohol consumption and the testimony of his wife and doctors, without explaining how those discrepancies bear any legitimate relationship to Mihaylov's asylum claim. <u>See</u> <u>Bojorques-Villanueva</u> v. <u>INS</u>, 194 F.3d 14, 16 (1st Cir. 1999) (explaining that an adverse credibility determination "must be based on discrepancies that involved the heart of the asylum claim") (citation and internal quotations omitted). Ultimately, it is impossible to avoid the conclusion that the IJ's legal

---

reasonable inference that Mihaylov was persecuted because of his political opinion.

[7] A "competent witness" is "a witness who is legally qualified to testify" whereas a "credible witness" is "a witness whose testimony is believable." <u>Black's Law Dictionary</u> 1596 (7th ed. 1999).

conclusions were colored by her assumptions and personal views about individuals who abuse drugs and alcohol. This suggestion of a lack of impartiality further undermines our confidence in the reasons given by the IJ in support of her finding that Mihaylov failed to establish past persecution. See Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994) ("[D]eference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole, or are merely personal views of the immigration judge.").

Where, as here, the IJ's reasoning is inadequate to support a finding of past persecution, we generally must remand to the BIA. This is so because if Mihaylov did in fact establish past persecution, he was entitled to a regulatory presumption of a well-founded fear of future persecution. El Moraghy, 331 F.3d at 204-05 (citing 8 C.F.R. § 208.13(b)(1)). In that case, the burden should have shifted to the government to refute that presumption by establishing a fundamental change of circumstances such that Mihaylov no longer has a well-founded fear of persecution. 8 C.F.R. § 208.13(b)(1)(i)(A). Here, the government never had to face that burden.

The government suggests, however, that it met that burden in any event by showing evidence of changed country conditions in Bulgaria, namely that the former communist regime is no longer in power. See Yatskin, 255 F.3d at 9-11 (excusing as harmless error

-16-

the BIA's failure to provide a reasoned basis for rejecting petitioner's past persecution claim where uncontested evidence of changed country conditions overcame any presumption of a well-founded fear). We do not agree that the record compels a conclusion that changed country conditions obviated any presumptive well-founded fear in Mihaylov's case. A regime change does not necessarily eliminate the objective basis for an applicant's fear of persecution at the hands of his former oppressors, even if those individuals were part of the old regime. As the Seventh Circuit recently explained, citing much of the same documentary evidence provided by Mihaylov, "there is evidence that Bulgaria's former communist bigwigs, quickly recycled as socialists and now busy cosying up to the United States, retain significant power in Bulgaria, especially and quite relevantly over the security service, and continue to pursue the old vendettas against anticommunists." Niam v. Ashcroft, 354 F.3d 652, 657 (7th Cir. 2004) (holding that regime change in Bulgaria did not establish that asylum applicant who had been persecuted for his anti-communist beliefs no longer had a well-founded fear of persecution).

Thus, the IJ's failure to provide adequate reasons for her rejection of Mihaylov's past persecution claim leaves us without a sufficient basis to affirm the BIA's decision. Under these circumstances, we remand to the BIA to determine whether

-17-

Mihaylov's testimony and supporting evidence establishes past persecution and hence a well-founded fear of future persecution on account of his political opinion.  See <u>Gailius</u>, 147 F.3d at 47 (noting that remand is appropriate in the asylum context "when a reviewing court cannot sustain the agency's decision because it has failed to offer legally sufficient reasons for its decision").

**IV.**

The order of the BIA is vacated, and the case is remanded to the BIA for further proceedings consistent with this opinion.

**<u>So ordered</u>**.